## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NewAge, Inc., *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-10819 (LSS)<br><br>(Jointly Administered) |
| NewAge, Inc., *et al.*,<br><br>　　　　　　　Plaintiffs,<br>vs.<br><br>Frederick Cooper, Mark Wilson, Brent Willis, and Kwikclick, Inc. a Delaware corporation,<br><br>　　　　　　　Defendants. | Adv. Proc. No. |

NewAge, Inc., *et al.* ("**NewAge**"), for its Complaint against Defendants, Frederick Cooper, Mark Wilson, Brent Willis, and Kwikclick, a Delaware corporation ("**Defendants**"), alleges:

### INTRODUCTION

NewAge brings this Complaint to stop Defendants' brazen scheme either to seize control of NewAge and its business or to undermine NewAge's relationships with its business partners so seriously as to destroy the company's value as a going concern. The scheme has included (1) fraudulent misrepresentations and omissions by several Defendants in connection with the November 2020 acquisition of Ariix by NewAge; (2) fraudulently inducing NewAge to enter a license agreement with Kwikclick under which NewAge was required to pay exorbitant licensing

---

[1] The last four (4) digits of each of the NewAges' federal tax identification number are NewAge, Inc., (2263), Ariix LLC (9011), Morinda Holdings, Inc. (9756), and Morinda, Inc. (9188). NewAge's address is 7158 S. FLSmidth Dr., Suite 250, Midvale, Utah 84047.

fees for use of the same software that NewAge already bought in the Ariix acquisition and paid to further develop even after the acquisition; and (3) using NewAge's proprietary information and gifts of Kwikclick stock to induce NewAge's employees and key Brand Partners to threaten to leave NewAge for a competing business if Defendants Cooper and Wilson (rather than the current successful bidder) are not made controlling shareholders and officers of NewAge going forward. Defendants Cooper, Wilson, and Willis have engaged in much of this improper and self-dealing conduct in direct violation of the fiduciary duties they owe to NewAge. Unless restrained, this improper conduct will continue in violation of the state, federal, and common law rights of NewAge.

## THE PARTIES

1.      NewAge is a Delaware corporation maintaining offices at 7158 S. FLSmidth Dr., Suite 250, Midvale, Utah, 84047. NewAge develops, sells, and distributes health and nutritional products through independent distributors, called Brand Partners.

2.      Based upon information and belief, Defendant Frederick Cooper is an individual residing in Farmington, Utah. Cooper has served as a NewAge director, from on or about November 2020 to the present. On information and belief, Cooper and Wilson were majority and/or controlling shareholders and officers of Ariix prior to the merger. Cooper also was, until September 1, 2022, a member of the Kwikclick board of directors and served as that company's CEO.

3.      Defendant Mark Wilson is an individual residing in Mesquite, Nevada. Wilson has served as NewAge's Group President since November 2020.  On information and belief, Wilson and Cooper were majority and/or controlling shareholders and officers of Ariix prior to the merger.

4.      Defendant Brent Willis is an individual residing in Evergreen, Colorado. Willis served as NewAge's Chief Executive Officer from April 2016 to January 2022.

5.     Defendant Kwikclick, Inc. is a Delaware corporation that with its principal place of business located at 876 East Vine Street, Murray, Utah, 84107.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157, 1334, and 2201.  The statutory predicate for the relief sought herein are §§ 105(a), 544, 548, and 550 of the Bankruptcy Code as supplemented by Federal Rules of Bankruptcy Procedure 7001 and 7065. This is a core proceeding under 28 U.S.C. § 157(b)(2).

7.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     NewAge consents to the entry of a final order or judgment by this Court.

## GENERAL ALLEGATIONS

### NewAge's Background and Business Operations

9.     NewAge develops, sells, and distributes health and nutrition products, including through a robust direct sales distribution network across approximately 50 countries, primarily in North America, Japan, China, and Europe. Products are sold through an extensive direct sales network, utilizing a team of approximately 400,000 Brand Partners (the "**Brand Partners**").

10.     NewAge sells products primarily through direct sales made by non-employee Brand Partners. Brand Partners typically work with other Brand Partners in their "downlines" – sales associates who help grow the sales for the company.

11.     NewAge does not directly sell products to individual consumers, but rather provides global services to its affiliates, including Brand Partners and their sales organizations, such as, brand development and marketing, product procurement, and distribution. NewAge provides services related to the management and training of Brand Partners, including encouraging Brand Partners to promote additional sales. For example, NewAge hosts marketing and education

events for the Brand Partners and their sales teams' leadership intended to teach, assist and expand marketing and sales efforts.

12.     NewAge's products are sold in the following markets: (i) health and wellness; (ii) health appearance; and (iii) nutritional performance.

### NewAge's Merger with Ariix, LLC

13.     Before being acquired by NewAge, Ariix was a competing network marketing company (also known as a "direct selling," "multi-level marketing," or "MLM" company) founded by Defendant Cooper.

14.     In or around February 2020, Ariix approached NewAge regarding a potential business combination.

15.     On or about July 20, 2020, NewAge and Ariix announced that they had entered into a definitive agreement for NewAge to acquire Ariix and its affiliates.

16.     On or about November 16, 2020, NewAge completed its acquisition of Ariix.

17.     NewAge's acquisition of Ariix was governed by the Amended and Restated Agreement and Plan of Merger dated September 30, 2020 by and between NewAge, Inc., Ariix, LLC, and certain individual members of Ariix ("**Sellers**"), including Defendants Cooper and Wilson (among others) (the "**Merger Agreement**").

18.     Under Section 3.4 of the Merger Agreement, Sellers represented that Ariix did not have any liabilities beyond those reflected, described, or reserved against in Ariix's balance sheet.

19.     Under Section 3.7 of the Merger Agreement, Sellers represented that Ariix "is, and since January 1, 2017 has been, in compliance with all Applicable Laws (including those related to maintaining Permits required of the Company to conduct its business), except where such non-compliance would not be likely to result in a Material Adverse Effect. No written notice has been

received by [Ariix] from January 1, 2017 to date of the Agreement from any Governmental Authority alleging that [Ariix] is not or was not in compliance with any Applicable Law."

20.     Under Section 3.8 of the Merger Agreement, Sellers represented that they had disclosed all material contracts of Ariix to NewAge, including contracts to develop intellectual property for Ariix and contracts by which Ariix was involved in a joint venture or similar contract.

21.     Under Section 3.13(c) of the Merger Agreement, Sellers represented that Ariix had "taken all actions reasonably necessary to maintain . . . the secrecy of all confidential Intellectual Property used or practiced in the Business."

22.     The Merger Agreement defined "Intellectual Property" broadly and expressly included "Software":

> in any and all jurisdictions throughout the world, rights in any trademark, service mark, trade name, trade dress, goodwill, patent, copyright, design, logo, formula, invention (whether or not patentable or reduced to practice), concept, domain name, website, social media username (e.g., Twitter handle), personalized subdomain or vanity URL, trade secret, know-how, process, formula, model, research and development, data and databases, confidential information, mask work, product design, Software, technology or other intangible asset of any nature, whether in use, under development or design or inactive (including any registration, application or renewal regarding any of the foregoing and, with respect to patents, any reissues, divisions, extensions, provisionals, continuations and continuations-in-part thereof).

23.     Under Section 3.19 of the Merger Agreement, Sellers represented that "no employee, officer, manager, partner or Member of the Company . . . owns any material direct or indirect interest of any kind in, or controls, or is a manager, officer, employee or partner of . . . any Person [including corporate entities] which is a competitor . . . of the Company."

24.     Under Section 3.20 of the Merger Agreement, Sellers warranted that since January 2012, they had not directly or indirectly (i) violated any provision of any anti-corruption or anti-bribery law, including the Foreign Corrupt Practices Act ("**FCPA**"); or (ii) "taken any act in

furtherance of any payment, gift, bribe, rebate, loan, payoff, kickback, or other transfer of value … to any Government Official… or Governmental Agency."

25.     Under Section 5.2 of the Merger Agreement, Sellers warranted that they would continue to conduct Ariix's business in the ordinary course until the closing, including among other things that Arix would not "make any purchase, sale, or disposition or abandonment of any asset, property or right . . .  that would be material to [Ariix]" without permission from NewAge.

26.     Under Section 5.5(b) of the Merger Agreement, Sellers agreed to "treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to [NewAge] or destroy, at the option of [NewAge], all tangible embodiments (and all copies) of the Confidential Information that are in their possession."

27.     The Merger Agreement defines "Confidential Information" to include "all confidential, proprietary, or non-public information of or relating to (a) [NewAge] or any of its Affiliates or (b) any of [Ariix] and [Ariix's] Subsidiaries that is not otherwise publicly disclosed or generally available (other than as a result of a disclosure by Sellers)."

28.     Under Section 5.12(a)(i) of the Merger Agreement, Sellers, other than Cooper, agreed they would not directly or indirectly "solicit or assist in soliciting, in competition with the Business," any person with whom they had personal contact or over whom they had direct or indirect supervisory or reporting responsibilities for two years after the closing date.

29.     Under Section 5.12(a)(ii)(A) of the Merger Agreement, Sellers, other than Cooper, agreed they would not directly or indirectly "engage in the business of marketing or selling beauty, nutrition, or lifestyle products (a 'Competitive Business')" for two years after the closing date.

30.     Under Section 5.12(a)(ii)(C) of the Merger Agreement, Sellers, other than Cooper, agreed they would not "acquire a financial interest in . . . any Competitive Business" for two years after the closing date.

31.     Under Section 5.12(a)(ii)(D) of the Merger Agreement, Sellers, other than Cooper, agreed they would not "interfere with, or attempt to interfere with, business relationships between [Ariix] or any of its Affiliates or Subsidiaries and their customers, manufactures, licensors, vendors, lessors, or investors" for two years after the closing date.

32.     Under Section 5.12(a)(iv), Sellers, other than Cooper, agreed they would not "directly or indirectly, solicit or encourage any employee of [Ariix] or any of [Ariix] Subsidiaries or its Affiliates or their respective successors or assigns to leave such employment" for two years after the closing date.

33.     The restrictive covenants contained in the Merger Agreement are valid and enforceable restrictions, reasonable under the circumstances to protect the confidential information and goodwill NewAge acquired under the Merger Agreement.

34.     The restrictive covenants contained in the Merger Agreement remain in full force and effect.

35.     Under Section 8.3(a) of the Merger Agreement, Sellers agreed that New Age "will be entitled to an injunction and other equitable relief (without posting any bond or other security) to prevent breaches hereof" and that "in the event any Sellers breach this Agreement, money damages may be inadequate and [NewAge] would have no adequate remedy at law, so that [NewAge] may, in addition to any other rights and remedies existing in its favor, to seek [sic] enforcement of its rights and each other Party's obligations hereunder not only by action for damages but also by action for specific performance, injunctive, or other equitable relief."

36.     The merger between NewAge and Ariix closed on November 16, 2020.

37.     After NewAge acquired Ariix, Cooper became a director of NewAge, Wilson became an officer (Group President) of NewAge, and Willis continued as a director and CEO of NewAge. In these capacities, Cooper, Wilson, and Willis owed fiduciary duties to NewAge.

38.     Cooper remains a director of NewAge. On January 10, 2022, the NewAge Board of Directors agreed with Willis that he would resign as CEO and director, effective immediately.

**Defendants Pre-Merger Misrepresentations**

39.     Despite their representations in the Merger Agreement, and as described in more detail below, Defendants had in fact failed to take all steps necessary to protect Ariix's assets, including its intellectual property (Defendants had already given a complete copy of Ariix's ICONN software to its former employee, Wenhan Zhang, to use at Kwikclick) and failed to disclose known potential liabilities including the existence of potential FCPA violations. NewAge was unaware of these misrepresentations. Each such misrepresentation induced NewAge to enter into the Merger Agreement.

**Cooper and NewAge Agreed to Various Restrictive Covenants**

40.     On or about January 28, 2021, Defendant Cooper and New Age executed a Non-Compete, Non-Solicitation, and Non-Disparagement Agreement (the "**Cooper Noncompete Agreement**").

41.     By its terms, the Cooper Noncompete Agreement was effective as of November 16, 2020.

42.     Cooper agreed to a five-year period during which he would not use Ariix or NewAge confidential information: under Section 2.A(i), Cooper agreed to "not use, disclose or archive any Ariix Confidential Information or NewAge Confidential Information during the five years from and after the date this agreement is actually signed by the parties . . . except solely for

the benefit of NewAge as might be requested and permitted unequivocally in writing by the CEO

of NewAge in his or her sole discretion."

43.    Cooper agreed to perpetual non-use of the NewAge information that he learned or

gained access to in the course of performing his duties as a director of NewAge: under Section

2.A(ii), Cooper "further acknowledges that in the course of performing future obligations he may

have as a member of the Board of Directors or as a consultant when so employed by NewAge, he

may be granted access to and entrusted with NewAge Confidential Information, the disclosure of

which to competitors or to the general public would be highly detrimental to the best interests of

NewAge. Except as may be required in the course of diligently performing any such future

obligations, Dr. Cooper shall not disclose, use, archive or exploit NewAge Confidential

Information."

44.    Cooper also agreed he would not compete with NewAge for a period of five years,

ending on January 28, 2026: under Section 2.B, Cooper agreed

> Cooper shall not at any time during the Term, either individually or in partnership,
> jointly or in conjunction with any person or persons, firm, association, syndicate,
> or company (each, a "Person"), directly or indirectly engage in, carry on or
> otherwise have any interest in, advise, or permit Dr. Cooper's name to be used in
> connection with any network marketing or multi-level marketing business or any
> other business which provides the same or substantially similar services or products
> as NewAge. This prohibition of competition does not apply to Dr. Cooper's
> envisioned KWIKClick software sales and compensation system. Regarding
> KWIKClick, Dr. Cooper is permitted to promote and profit from such system even
> if used by other network marketing or beneficial interest in the business being
> served. Specifically, KWIKClick cannot be used as a front for an MLM business
> benefiting Dr. Cooper or his family. Dr. Cooper affirmatively covenants that he will
> not promote KWIKClick as network marketing or MLM company. KWIKClick
> shall not offer bonuses, awards, or incentives similar to those traditionally offered
> by network marketing companies, *e.g.*, no trips, conventions, progressive titles,
> downline bonuses, etc.

45.    Cooper agreed not to solicit NewAge's employees or Brand Partners for a period

of two years: Under Section 2.C, Cooper agreed "For a period of two years, Dr. Cooper shall not

solicit, entice away, or interfere with any contractual relationship (or attempt to do so) for any individual providing essential services to NewAge (whether as an employee, contractor, or consultant). During the Term, Dr. Cooper shall not solicit, entice away, or interfere with any contractual relationship for any independent consultant or distributor of NewAge/Ariix to enter into a contract with another network marketing or MLM company."

46.    Cooper agreed that in the event of a breach or threatened breach, NewAge would be entitled to the entry of injunctive relief against him: Under Section 2.F, Cooper agreed that "If Dr. Cooper breaches or threatens to breach this Agreement, Dr. Cooper hereby consents and agrees that money damages would not afford an adequate remedy and that NewAge is entitled to seek and receive a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief."

**Cooper Unsuccessfully Attempted to Modify His Restrictive Covenants**

47.    On or about August 18, 2021, Cooper and Willis executed a purported letter agreement meant to cancel the restrictions of the Cooper Noncompete Agreement and amend the Merger Agreement.

48.    The August 18, 2021 letter states, among other things, that the Cooper Noncompete Agreement "is hereby terminated and is null and void for all purposes."

49.    The August 18, 2021 letter purports to amend the Merger Agreement as follows: "the first sentence of Section 5.12 of the Merger Agreement is amended to delete the phrase 'other than Fredrick Cooper.'" The effect of such an amendment to the Merger Agreement would be to impose the restrictive covenants contained in Section 5.12 of the Merger Agreement on Cooper.

50.     The purported letter agreement dated August 18, 2021, however, lacks adequate consideration.

51.     The purported letter agreement dated August 18, 2021 also fails because Willis lacked the authority to modify or cancel the Cooper Noncompete Agreement or amend the Merger Agreement without approval of a majority of the disinterested directors of NewAge.

52.     A majority of the disinterested directors of NewAge were not made aware of nor given an opportunity to approve or reject the purported letter agreement. The majority of the disinterested directors of NewAge have not approved the modification or cancellation of the Cooper Noncompete Agreement.

**Cooper Owes Contractual and Fiduciary Duties to New Age**

53.     As a director of NewAge, Cooper is bound by the Code of Ethics and Conduct of NewAge Beverages Corporation (the "**Code of Ethics**").

54.     Among other things, the Code of Ethics requires Cooper to perpetually maintain the confidentiality of all NewAge confidential information: Section 8 provides "Directors, officers and employees should maintain the confidentiality of information entrusted to them by the Company or by its customers, suppliers or partners, except when disclosure is expressly authorized or is required or permitted by law." Section 6.3 of the Code of Ethics provides "The obligation to protect Company assets includes the Company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Unauthorized use or distribution of this information is prohibited."

55.     The Code of Ethics prohibits Cooper from competing with NewAge: Section 7 of the Code of Ethics provides "no director . . . may compete with the Company."

56.     As a director of NewAge, Cooper also owes fiduciary duties of loyalty and due care to NewAge.

### Defendants Used Ariix Intellectual Property, Resources and Personnel to Form a Competing Venture, Kwikclick

57.     In or around January 2020, certain Ariix employees started work on a project to update Ariix's customer relationship management ("**CRM**") system. At the time, Ariix's CRM system was called ICONN.

58.     ICONN was Ariix proprietary software, owned by Ariix and developed by Ariix personnel at Ariix's expense.

59.     ICONN software included a so-called "commission engine," which kept records of sales made by Ariix's Brand Partners and calculated commissions that were due to the Brand Partners based on the applicable compensation plan.

60.     ICONN included a user feature called "smart links," which allowed Ariix's Brand Partners to send and receive links to a pre-populated shopping cart of products on Ariix's e-commerce platform. Ariix intended "smart links" to assist its Brand Partners with selling Ariix products through social media.

61.     By June 2020, Ariix and NewAge were engaged in negotiations for NewAge to acquire Ariix's business as a going concern, including Ariix's intellectual property.

62.     Cooper acted as Ariix's agent in the negotiation of the terms of the merger with NewAge.

63.     At the same time Cooper was negotiating the terms of the Merger Agreement, Cooper, Wilson, and others were also setting up Cooper's competing business, Kwikclick.

64.     In or around February 2020, Cooper organized Kwikclick. Since at least June 2020, Cooper has been and remains the majority owner of Kwikclick.

65.     Cooper still owns approximately 53.4% of the outstanding shares of Kwikclick. Until approximately September 2022, Cooper acted as the CEO of Kwikclick. In or around September 2022, Cooper resigned as CEO of Kwikclick.

66.     In or around June 2020, without the knowledge of NewAge, Cooper directed Ariix to transfer a copy of the source code for ICONN to Wenhan Zhang for use in developing Kwikclick's business.

67.     In or around June 2020, Ariix terminated Zhang, who until that time was Ariix's Chief Information Officer. After his termination by Ariix, Zhang started a new position as Chief Information Officer of Kwikclick. However, even after his supposed termination as an employee of Ariix, Zhang continued to draw his salary from Ariix.

68.     On information and belief, Cooper directed Ariix to continue to pay Zhang's salary in order to benefit Cooper's new company, Kwikclick.

69.     Cooper instructed Ariix's software development team in China to devote a significant amount of time and attention to development of Kwikclick software. Cooper did this solely for the benefit of his new company, Kwikclick.

70.     Ariix did not disclose to NewAge before the merger that at least four Ariix software developers were devoting significant time and attention to the development of a competing software product on behalf of Kwikclick. Nor did Ariix disclose that a copy of the ICONN software source code had been provided to Kwikclick.

71.     On information and belief, other Ariix corporate resources were used to develop Kwikclick's software and otherwise advance Kwikclick's business.

72.     On information and belief, after the merger with NewAge, Cooper instructed Tyler Jones, formerly of Ariix and after the merger NewAge's Vice President, Legal, to draft and

backdate a sham agreement between Ariix and Kwikclick regarding the ICONN source code. The sham agreement was not disclosed to NewAge before NewAge acquired Ariix.

### After NewAge Acquires Ariix, Defendants Continue to Channel NewAge Resources Towards Development of Kwikclick

73.     After NewAge completed its acquisition of Ariix, Cooper and the other Defendants continued to exert influence over the combined entity's business.

74.     After the merger, Cooper became a director of NewAge. While Cooper has no executive role within the NewAge enterprise, legacy employees of Ariix continued to perceive Cooper as having the authority to dictate business decisions within the company. This perception was reinforced by Cooper's frequent presence in the corporate office, and his falsely holding himself out as the Chairman of the Board at his frequent speaking engagements with Brand Partners beyond the typical role of a corporate director. On information and belief, Cooper charged his expenses for the appearances to NewAge.

75.     Although Cooper lacked any management authority, NewAge employees perceived his role as being a "co-CEO" of NewAge along with Brent Willis.

76.     Cooper actively promoted this perception. He took up residence in a large, impressive office suite at the top floor of NewAge's building. He attended management meetings and commented on the strategic direction of the company.

77.     In or around February 2021, Cooper met with NewAge's then-CFO, Gregory Gould. In this meeting, Cooper told Gould that in order to help expedite the development of Kwikclick, NewAge needed to support Kwikclick's development effort at a cost of $200,000 per month. Cooper told Gould that NewAge was not taking Kwikclick seriously enough and that would have to change. At the time, based on Cooper's previous representations, NewAge expected the Kwikclick software to be ready by July 2021. Cooper said that Kwikclick would not be ready to

roll out by that deadline unless NewAge incurred the additional software development expense of $200,000 per month to support Kwikclick's ongoing research and development. At Cooper's direction, and with Willis's acquiescence, NewAge proceeded to incur this additional expense for the benefit of Kwikclick.

78.     On information and belief, NewAge was not obligated to incur development expenses to Kwikclick. At the time Cooper caused NewAge to divert funds to support Kwikclick's development, there was no contract in place between NewAge and Kwikclick.

**Defendants Use Their Influence to Coerce NewAge to Pay Kwikclick For a License to Kwikclick's Software Virtually Identical to The Software Cooper and Ariix Sold to NewAge**

79.     Cooper exerted a single-minded zeal to ensure that Kwikclick software was promoted by NewAge.

80.     When NewAge employees questioned whether a license agreement with Kwikclick was warranted, Cooper directly threatened and intimidated the NewAge employees who spoke out against his plan.

81.     In or around December 2020, Cooper met with Blake Heringer, then NewAge's Chief Information Officer. Heringer had expressed doubts regarding the value of Kwikclick and warned of the possibility that Kwikclick could misuse its access to NewAge Brand Partner data to unfairly compete with NewAge. During the December 2020 meeting, Heringer asked Cooper to explain the functionality and purpose of Kwikclick. After Cooper did so, Heringer said to Cooper that "you are building another MLM and it is called Kwikclick." Cooper responded "that's exactly right." Heringer then accused Cooper of planning to use Kwikclick to "get NewAge's customers and build another MLM" using that data. Cooper responded, "now you're getting it."

82.    Heringer shared his concerns with NewAge management, including then-CEO Willis. At the time, Heringer believed that Kwikclick was a scam designed to gather information regarding NewAge's Brand Partners and use that data to build a new, competing MLM.

83.    During a December 9, 2020 meeting of the NewAge Board of Directors, the board was informed of the existence of Kwikclick and the fact that it was "owned by Fred Cooper." Cooper then described the Kwikclick app. The minutes of the December 9, 2020 board meeting reflect that "[t]he Board requested a full review of the financial relationship for licensing rights to Kwik Click to avoid any appearance of conflicted interests." At the conclusion of the meeting, the Board of Directors tasked the NewAge executive team, which included Defendants Wilson and Willis, with "Provid[ing] particulars of Kwik Click, including a business plan fully describing the economics. Additionally, fully disclos[ing] any probable financial interest inuring to Directors, Officers or other management employees through implementation of the Kwik Click system. ***The Board will need to approve the arrangement which appears to be a related-party transaction***." (emphasis added)  The Board of Directors repeatedly requested that it be kept informed of and approve any Kwikclick agreement throughout 2021.

84.    Unfortunately, Heringer's concerns, and the Board's express instruction, went unheeded. NewAge in fact entered a license agreement with Kwikclick to license the Kwikclick software.

85.    On or about September 2, 2021, NewAge and Kwikclick entered into a Software Licensing and Exclusivity Agreement (the "**License Agreement**").

86.    The License Agreement was executed by Willis for NewAge, and Cooper for Kwikclick. Willis and Cooper knew that Willis had no authority to cause NewAge to enter into

the License Agreement because the NewAge board of directors had explicitly retained the authority to approve the deal itself and had not provided its approval.

87.     Despite repeated requests, NewAge's board did not have the opportunity to review a copy of the License Agreement before it was executed by Defendant Willis.

88.     The terms of the License Agreement are not standard. They are highly favorable to Kwikclick and detrimental to NewAge.

89.     Before entering into the License Agreement, Defendant Willis ordered a code comparison between the source code for Kwikclick and the source code for the ICONN software that NewAge acquired through its acquisition of Ariix. The source code comparison revealed a 95% match between the Kwikclick software and the existing ICONN software. On information and belief, this level of similarity would ordinarily be impossible unless a large portion of Kwikclick's software is an exact copy of ICONN software.

90.     On information and belief, Defendant Willis did not inform the disinterested directors of NewAge that the NewAge-owned source code for ICONN was a 95% match for the Kwikclick source code.

91.     The License Agreement was not approved or ratified by the disinterested directors of NewAge, who were never provided all the material facts necessary to assess the terms of the License Agreement.

92.     The License Agreement provided that NewAge would pay Kwikclick a licensing fee of $50,000 per month for the duration of the License Agreement. The License Agreement also required NewAge to pay substantial commissions on sales of product by NewAge Brand Partners through the Kwikclick platform.

93.     The License Agreement contained various restrictive covenants with respect to Defendants' use of the data that Kwikclick obtained from NewAge through the License Agreement.

94.     Section 10.2 of the License Agreement provides that Kwikclick and NewAge "jointly own the consumer information that will be gathered by the Software during either the selling of NewAge's products to customers through the Software or the selling of non-NewAge products to NewAge's Brand Partners and NewAge customers through the Software." Section 10.2 expressly limits Kwikclick's rights to use the information collected on the software about NewAge's Brand Partners: "The jointly owned consumer information gathered by the Software may only be used for the benefit of the Parties collectively and may not be sold, transferred, or used for the benefit of only one Party without the written consent of the other Party. All such consumer information will be considered confidential information (as defined below) and subject to the confidentiality restrictions stated below."

95.     Section 10.2 also expressly limited Kwikclick's right to use any information about NewAge Brand Partners that Kwikclick obtained from NewAge: "The NewAge Brand Partner and NewAge customer database and associated Brand Partner and NewAge customer information will be owned exclusively by NewAge."

96.     Under Section 10.2(c) of the License Agreement: "NewAge owns the relationship (the 'Relationship') with its current and future Brand Partners and customers. For the purpose of this Agreement, Relationship is defined as the right to communicate and interact with its Brand Partners and customers, even those who use the Software."

97.    Section 10.2(d) provided that "KWIKClick will not at any time, without the prior written express consent of NewAge, solicit or entice current or future Brand Partners or NewAge customers to disrupt or to sever their relationships with NewAge for any reason."

98.    Kwikclick expressly represented to NewAge in the License Agreement that it was the sole owner of the source code for Kwikclick and that it had obtained the necessary rights and authorizations to that source code. Section 11.1 of the License Agreement provides:

> Kwikclick hereby represents and warrants to NewAge that Kwikclick is the owner of the Software and that it is fully authorized to license the Software to NewAge. Kwikclick represents, warrants, and agrees that: Kwikclick has all intellectual property rights necessary to license the Software to NewAge according to the terms of this Agreement; Kwikclick is the sole owner or is a valid licensee of the Software and has secured all necessary licenses, consents, and authorizations with respect to the use of the Software to the full extent contemplated herein, including, but not limited to: all source code, text, pictures, audio, video, logos and copy contained therein; the Software does not and will not infringe upon any patent, copyright, trademark or other proprietary right or violate any trade secret or other contractual right of any third party.

99.    Contrary to these representations, Kwikclick was not authorized to license the software to NewAge. Among other things, neither Ariix nor NewAge had ever properly granted Kwikclick permission to use its ICONN source code as the basis for developing Kwikclick's competing software.

**Defendants Use NewAge Resources to Drive Business to Kwikclick**

100.    Both before and after NewAge and Kwikclick signed the License Agreement, Defendants used corporate resources of NewAge to drive business to Kwikclick.

101.    Defendants ensured that NewAge engaged in a campaign to train NewAge Brand Partners on how to promote Kwikclick to their downlines and encouraged all Brand Partners to finalize their sales through Kwikclick, rather than through NewAge directly.

102.    Defendants' encouragement of NewAge Brand Partners to use Kwikclick was detrimental to NewAge, as Kwikclick charged NewAge a commission on each sale.

**NewAge's Proprietary Information Regarding Its Brand Partners Is Core to NewAge's Business**

103.    NewAge is a network marketing company. The majority of NewAge's sales come through its network of Brand Partners. Therefore, NewAge's relationships with its Brand Partners are a critically valuable part of NewAge's business.

104.    NewAge has more than 400,000 Brand Partners worldwide. Each Brand Partner is subject to a compensation formula that determines the commissions that Brand Partner is due from sales of that Brand Partner and others within that Brand Partner's network. The compensation formula that applies to any single Brand Partner's earnings varies because of differences in geography, product pricing, or the specific terms and conditions to which any Brand Partner is subject.

105.    Among other things, NewAge's proprietary information includes various information about its Brand Partners, including the identities of NewAge's network of Brand Partners, the relationship of each Brand Partner to a Sales Affiliate, the relationship of each Brand Partner to other Brand Partners, the compensation rules applicable to each Brand Partner, the sales volume generated by each Brand Partner, the compensation paid to each Brand Partner, the sales history of each Brand Partner, and the rewards and other non-cash compensation paid to each Brand Partner (the "**Brand Partner Information**").

106.    NewAge treats the Brand Partner Information as confidential and proprietary. The Brand Partner Information is never shared outside NewAge except when strictly necessary for business purposes and under the protection of an appropriate confidentiality agreement.

107.    The Brand Partner Information is not readily ascertainable from publicly available sources. For example, gathering a full list of NewAge's active Brand Partners would not be possible from public sources because not all NewAge Brand Partners advertise their affiliation

with NewAge in the public domain. Even if one knew the identity of a particular Brand Partner, it would not be possible to tell from publicly available sources how much NewAge product that Brand Partner sold in a given period. NewAge does not publicly disclose the commission model applicable to any of its Brand Partners.

108.    The Brand Partner Information derives independent economic value by its secrecy. The Brand Partner Information is like a road map to one of NewAge's most valuable resources— its network of Brand Partners. The Brand Partner Information allows NewAge to properly compensate its Brand Partners, stimulate additional sales, and otherwise operate a network marketing company.

109.    NewAge takes reasonable measures to maintain the secrecy of its Brand Partner Information. The Brand Partner Information is available only on a need-to-know basis within the company. Only a limited number of NewAge employees have access to Brand Partner Information. Access to the Brand Partner Information requires authorization from NewAge management. The Brand Partner Information is password protected. NewAge employees with access to the Brand Partner Information are subject to confidentiality agreements and other restrictive covenants. All NewAge employees are subject to a NewAge Employee Handbook, which requires employees to keep nonpublic NewAge information confidential both during and after employment with NewAge. NewAge does not share the Brand Partner Information with third parties except where such sharing fulfills a business need and where the Brand Partner Information is subject to an appropriate confidentiality agreement.

**Defendants Use NewAge Trade Secrets and Confidential Information to Interfere with the Sale of NewAge's Assets**

110.    Because of Defendants actions, as described above, including the undisclosed FCPA violations, misrepresentation concerning Ariix's working capital (Defendants represented

Ariix had more than $11 million in working capital when, in reality it had negative $18 million) and the improper and exorbitant payments to Kwikclick under the License Agreement, NewAge's financial performance faltered after the Ariix acquisition. NewAge's liquidity crisis precipitated the need for NewAge to seek strategic alternatives and ultimately file for bankruptcy.

111.    As part of its efforts to avoid bankruptcy, NewAge engaged in discussions with several potential buyers, including Cooper. Discussions with Cooper ultimately broke down when he refused to sign an appropriate non-disclosure agreement and failed to provide proof of funds or agree to terms acceptable to the Special Committee of the Board of Directors overseeing the sale process.

112.    As discussions with Cooper were breaking down, NewAge had discussions with John Wadsworth and ultimately negotiated an Asset Purchase Agreement with DIP Financing, LLC, an entity controlled by Wadsworth.

113.    On September 21, 2022, the Court entered the *Order (A) Approving Bid Procedures for the Sale of Assets of the Debtors, (B) Approving Bid Protections, (C) Establishing Assumption and Assignment Procedures, (D) Establishing Notice Procedures, and (E) Granting Related Relief* [Bankr. Doc. No. 105] (the "**Bid Procedures Order**"). The Bid Procedures Order approved DIP Financing, LLC as a qualified bidder for substantially all of NewAge's assets and provided a process for other parties to submit bids and an auction, if necessary.

114.    Before NewAge acquired Ariix, Defendants Cooper and Wilson held positions of trust and confidence within Ariix. On information and belief, through those positions, Defendants Cooper and Wilson had access to Ariix confidential business information and trade secrets regarding the operation of Ariix's business, including the identities of Ariix's key Brand Partners. Furthermore, Defendants Cooper and Wilson were the public faces of Ariix and were therefore

entrusted with representing Ariix to Brand Partners and the public. A significant amount of Ariix's goodwill is connected to the public relations function served by Defendants Cooper and Wilson.

115.    When NewAge acquired Ariix, it became the sole owner of the confidential information, trade secrets, and goodwill of Ariix. As part of the deal for NewAge to acquire Ariix, the Sellers (including Cooper and Wilson individually) agreed to maintain the confidentiality of Ariix's confidential information and trade secrets.

116.    After NewAge acquired Ariix, Cooper and Wilson continued to hold positions with NewAge. Cooper became a Director of NewAge, and Wilson became NewAge's Group President. In these positions, Cooper and Wilson were given confidential business information and trade secrets regarding NewAge's business, including information regarding the Ariix network of Brand Partners and new information about NewAge's network of Brand Partners.

117.    All NewAge personnel are subject to a NewAge Employee Handbook, which requires employees to keep nonpublic NewAge information confidential both during and after their time with NewAge.

118.    As part of implementing the Kwikclick software on NewAge's system, New Age provided Kwikclick access to certain confidential and proprietary data regarding its Brand Partners, including the Brand Partner Information. NewAge did so relying on the various restrictions on Kwikclick's use of that proprietary and confidential data under the License Agreement.

119.    In 2022, Kwikclick's shares began public trading. Defendants Cooper and Wilson began issuing shares in Kwikclick to NewAge executives and top Brand Partners and sales leaders around the world. The NewAge board of directors were not given notice of these gifts.

120.    On information and belief, Cooper arranged for the distribution of Kwikclick shares to NewAge executives and Brand Partners as a way to buy loyalty and to solicit the business of those executives and Brand Partners and to incentivize the executives and Brand Partners to promote the use of Kwikclick within the NewAge organization.

121.    For example, Cooper arranged to provide shares in Kwikclick to Ishim Benallal, NewAge's General Manager in Europe. On information and belief, Cooper also arranged for Kwikclick shares to be distributed to key NewAge Brand Partners Aaron Decker, Masa Miama, Ginger Decker, Erick Decker, and Rick Billings.

122.    NewAge regularly holds meetings with its top Brand Partners, a group called the "Founders Club." At an August 30, 2022 Founder's Club special emergency meeting in Orlando, Florida, Defendant Wilson told the group of key Brand Partners that his noncompete agreement and the noncompete agreement of Cooper would expire in November 2022. Wilson told the group that as of November 2022, he and Cooper would be "free agents." Wilson told the group that the remainder of the group were also "free agents." These statements were meant to solicit NewAge's top Brand Partners (members of the Founders Club) to compete with NewAge by working with a new venture formed by Cooper and Wilson in violation of the restrictive covenants applicable to Cooper and Wilson.

123.    On or about August 31, 2022, Phil Lewis (the operations executive formerly of Ariix and now employed by NewAge) reported to John Wadsworth that he had spent ten hours with Cooper on August 30, 2022. Lewis reported to Wadsworth that "the Ariix team is mobilizing," and the "team" planned to "leave as a group" unless everyone who lost money on NewAge stock was made whole.

124.     Lewis also told Wadsworth that if Wadsworth did not "make Fred [Cooper] an owner," then Wadsworth would "lose the entire Ariix team." Lewis told Wadsworth that he should give up 30% of the NewAge business to Cooper or else Wadsworth would lose half of the business when Cooper left the company.

125.     On or about September 2, 2022, Tim Sales, a significant Brand Partner for NewAge, told Wadsworth that "if you don't make Fred an owner, or give Fred the Ariix business, everyone will leave, and you will lose half of your investment." Sales was an early Brand Partner for Ariix. Sales and his downline Brand Partners are responsible for a large volume of sales of NewAge products.

126.     On September 16, 2022, Benallal told Wadsworth that all the European Brand Partners would leave NewAge if Cooper and Wilson were not made majority owners and controlling shareholders in the company that acquired NewAge's assets through the bankruptcy process. Benallal told Wadsworth he could destroy NewAge's European business in three days if he wanted to. In a presentation to NewAge's European Brand Partners, Benallal exhorted them to "take out your phone now and sign up for Kwikclick; do it now!" Benallal also told Wadsworth that Cooper had given him 6 million shares of Kwikclick, so he would no longer need to work if he did not want to.

127.     On information and belief, the coordinated, extortionate threats made by Lewis, Sales, and Benallal to Wadsworth were made at the direction or urging of Cooper and Wilson and for their personal benefit.

## <u>COUNT ONE</u>
### Tortious Interference With Contractual Relations
### (Against Cooper, Wilson, Willis, and Kwikclick)

128.     NewAge incorporates by reference the preceding paragraphs.

129.    NewAge has existing contractual relationships with its Brand Partners.

130.    NewAge reasonably expects that each of its Brand Partners will continue to do business with NewAge.

131.    NewAge reasonably expects that if its relationships with its Brand Partners continue, then NewAge will continue to generate new economic relationships with new Brand Partners affiliated with NewAge's existing Brand Partners.

132.    Defendants Cooper, Wilson, Willis, and Kwikclick are intentionally interfering with NewAge's existing contractual relationships with its Brand Partners and the future potential relationships with those Brand Partners and others.

133.    The interference by Defendants Cooper, Wilson, Willis, and Kwikclick with NewAge's existing and expected economic relationships is improper because that interference is aided by the misuse of NewAge's confidential and proprietary information and in breach of contractual and fiduciary duties owed to NewAge.

134.    As a result of Defendants' intentional tortious interference, NewAge will suffer irreparable harm to its business and economic injury.

**<u>COUNT TWO</u>**

**Breach of Fiduciary Duty**
**(Against Cooper)**

135.    NewAge incorporates by reference the preceding paragraphs.

136.    As a director of NewAge, Cooper owes NewAge fiduciary duties of care and loyalty.

137.    Cooper breached his fiduciary duties to NewAge by favoring his own interests above those of NewAge, by failing to disclose to NewAge the misrepresentations made by the Sellers under the Merger Agreement, exerting influence over NewAge to induce NewAge to enter

into the License Agreement with Kwikclick, directing NewAge assets to benefit the development and promotion of Kwikclick software, using his access to NewAge confidential information for his own benefit and for the benefit of Kwikclick, and using the corporate goodwill owned by NewAge for his own benefit and for the benefit of Kwikclick.

138.    The transactions by which Cooper breached his fiduciary duties to NewAge were not approved by the disinterested directors of NewAge.

139.    The terms of the License Agreement were not entirely fair to NewAge because the License Agreement provided that NewAge would pay for a license to use software that it had already purchased from Ariix and the exorbitant license fee paid by NewAge to Kwikclick, well above the fair market value of the Kwikclick software.

140.    But for Cooper's breaches of fiduciary duty, NewAge would have taken earlier action to address the misrepresentations made by the Sellers in the Merger Agreement, would have taken action to recoup its intellectual property from Kwikclick, would not have entered into the License Agreement and paid the consideration thereunder to Kwikclick, would not have spent corporate resources on the development of Kwikclick software or the promotion of that software to its Brand Partners, and would not have suffered the threat of losing a significant portion of its Brand Partners to a competing venture set up by Cooper.

141.    As a result of Cooper's breaches of fiduciary duty, NewAge will suffer irreparable harm to its business and economic injury.

**COUNT THREE**
**Breach of Fiduciary Duty**
**(Against Wilson)**

142.    NewAge incorporates by reference the preceding paragraphs.

143.    As a Group President of NewAge, Wilson owes NewAge fiduciary duties of care and loyalty.

144.    Wilson breached his fiduciary duties to NewAge by favoring his own interests above those of NewAge by failing to disclose to NewAge the misrepresentations made by the Sellers under the Merger Agreement, exerting influence over NewAge to induce NewAge to enter into the License Agreement with Kwikclick, directing NewAge assets to benefit the development and promotion of Kwikclick software, using his access to NewAge confidential information for his own benefit and for the benefit of Kwikclick, and using the corporate goodwill owned by NewAge for his own benefit and for the benefit of Kwikclick.

145.    The transactions by which Wilson breached his fiduciary duties to NewAge were not approved by the disinterested directors of NewAge.

146.    The terms of the License Agreement were not entirely fair to NewAge because the License Agreement provided that NewAge would pay for a license to use software that it had already purchased from Ariix and the exorbitant license fee paid by NewAge to Kwikclick, well above the fair market value of the Kwikclick software.

147.    But for Wilson's breaches of fiduciary duties, NewAge would have taken earlier action to address the misrepresentations made by the Sellers in the Merger Agreement, would have taken action to recoup its intellectual property from Kwikclick, would not have entered into the License Agreement and paid the consideration thereunder to Kwikclick, would not have spent corporate resources on the development of Kwikclick software or the promotion of that software to its Brand Partners, and would not have suffered the threat of losing a significant portion of its Brand Partners to a competing venture set up by Wilson and Cooper.

148.    As a result of Wilson's breaches of fiduciary duty, NewAge will suffer irreparable harm to its business and economic injury.

## COUNT FOUR

**Breach of Fiduciary Duty**
**(Against Willis)**

149.    NewAge incorporates by reference the preceding paragraphs.

150.    As the former Chief Executive Officer and director of NewAge, Defendant Willis owed NewAge fiduciary duties of care and loyalty.

151.    Willis breached his fiduciary duty of care by ceding management responsibility to Cooper (against the express direction of the NewAge board of directors), failing to properly assess the risks to NewAge in entering into the License Agreement, failing to appropriately compare the potential risks and benefits of the License Agreement to other possible software offerings, signing a purported letter agreement with Cooper purporting to reduce the terms of Cooper's restrictive covenants without adequate consideration, failing to obtain approval of the disinterested directors before entering into the purported letter agreement, entering into the License Agreement despite knowing that the Kwikclick software was based on NewAge-owned software, failing to adequately investigate the potential conflict of interest between NewAge and Kwikclick as a result of Cooper's roles at both companies, approving the unreasonable and one-sided terms of the License Agreement without board approval, and permitting NewAge corporate resources to be diverted to support the development of Kwikclick software.

152.    As a direct and proximate cause of Willis's breaches of fiduciary duty, NewAge purportedly entered into a letter agreement with Cooper to amend Cooper's restrictive covenants and NewAge entered into the License Agreement with Kwikclick.

153.    As a result of Willis's breaches of fiduciary duty, NewAge will suffer irreparable harm to its business and economic injury.

**COUNT FIVE**

**Breach of Contract – Merger Agreement**
**(Against Cooper and Wilson)**

154.    NewAge incorporates by reference the preceding paragraphs.

155.    The Merger Agreement is a binding contract, supported by adequate consideration.

156.    NewAge performed completely under the Merger Agreement.

157.    Cooper and Wilson are parties to the Merger Agreement, Cooper in his individual capacity as a Seller and in his capacity as Sellers Agent, and Wilson in his individual capacity as a Seller.

158.    Cooper and Wilson made various representations and warranties in the Merger Agreement, including the representations and warranties alleged herein.

159.    Certain representations and warranties of the Merger Agreement made by Cooper and Wilson were false.

160.    The false representations and warranties are material breaches of the Merger Agreement.

161.    As a result of the breaches of the Merger Agreement by Cooper and Wilson, NewAge has suffered economic losses, including the payment of the consideration due under the Merger Agreement.

**COUNT SIX**

**Fraud – Merger Agreement**
**(Cooper and Wilson)**

162.    NewAge incorporates by reference the preceding paragraphs.

163.    In the Merger Agreement, Cooper and Wilson made certain express representations and warranties with respect to Ariix's business.

164.    Cooper and Wilson made the express representations and warranties in the Merger Agreement with the intention to induce NewAge to enter into the Merger Agreement, acquire Ariix, and pay the substantial consideration provided for under the Merger Agreement.

165.    Cooper and Wilson knew or should have known that NewAge would rely on the express representations and warranties contained in the Merger Agreement in deciding to enter into the Merger Agreement.

166.    Cooper and Wilson knew or should have known that certain express representations and warranties contained in the Merger Agreement were false.

167.    In fact, NewAge relied on the express representations and warranties in the Merger Agreement in deciding to acquire Ariix and enter into the Merger Agreement.

168.    As a result of NewAge's reliance on the false representations and warranties of the Merger Agreement, NewAge has suffered economic harm.

**COUNT SEVEN**
**Fraud – License Agreement**
**(Cooper and Kwikclick)**

169.    NewAge incorporates by reference the preceding paragraphs.

170.    Before entering into the License Agreement, Cooper and Kwikclick knew that Kwikclick's code was based substantially on source code that Kwikclick obtained from Ariix.

171.    Cooper and Kwikclick knew or should have known that NewAge believed that the intellectual property rights related to Kwikclick were owned by Kwikclick.

172.    In the License Agreement, Kwikclick made various representations of fact with respect to its rights to license the Kwikclick software to NewAge and about the ownership of intellectual property rights related to the Kwikclick software.

173.    Kwikclick and Cooper made the representations in the License Agreement for the purpose of inducing NewAge to enter into the License Agreement.

174.    Kwikclick and Cooper knew that NewAge would rely on the representations in the License Agreement in entering into the License Agreement.

175.    NewAge relied on Kwikclick's representations in the License Agreement in entering into the License Agreement.

176.    Kwikclick and Cooper knew or should have known that the representations in the License Agreement concerning Kwikclick's ownership of intellectual property and authority to license the software to NewAge were false.

177.    As a result of the false representations of the License Agreement, NewAge has suffered harm, including economic harm.

178.    NewAge seeks rescission of the License Agreement as an equitable remedy for Kwikclick's and Cooper's fraud inducing NewAge to enter into the License Agreement.

179.    In addition to rescission, NewAge seeks damages/restitution for the economic losses it suffered as a direct and proximate result of entering into the License Agreement and performing thereunder.

## COUNT EIGHT
### Breach of Contract – License Agreement
### (Kwikclick)

180.    NewAge incorporates by reference the preceding paragraphs.

181.    Unless and until it is rescinded as a result of the fraud of Kwikclick, Cooper and Wilson, the License Agreement remains a valid and enforceable contract between NewAge and Kwikclick.

182.    NewAge has performed fully under the terms of the License Agreement.

183.    The License Agreement provides that Kwikclick's access to NewAge data will be limited to certain purposes, that the data that Kwikclick accesses regarding NewAge Brand Partners will remain NewAge intellectual property, and that new data generated by NewAge Brand Partners' use of the Kwikclick app may not be used by Kwikclick for any purpose other than for the benefit of NewAge.

184.    On information and belief, Kwikclick is in breach of the confidentiality and use restrictions of the License Agreement with respect to NewAge data.

185.    NewAge will suffer irreparable harm from Kwikclick's breach of the License Agreement.

186.    NewAge has suffered economic harm as a result of Kwikclick's breach of the License Agreement.

## COUNT NINE
### Aiding and Abetting a Breach of Fiduciary Duty
### (Kwikclick)

187.    NewAge incorporates by reference the preceding paragraphs.

188.    Kwikclick is fully aware of the fiduciary duties owed by Cooper to NewAge.

189.    Kwikclick knew that entering into the License Agreement would breach Cooper's fiduciary duties to NewAge.

190.    Kwikclick knowingly joined in Cooper's breach of his fiduciary duties to NewAge.

191.     As a result of Kwikclick's aiding and abetting Cooper's breaches of fiduciary duties to NewAge, Kwikclick is jointly and severally liable to NewAge for the harm caused to NewAge by Cooper's breaches of fiduciary duties.

### COUNT TEN
**Violation of the Defend Trade Secrets Act**
**(Against Cooper, Wilson, Willis, and Kwikclick)**

192.     NewAge incorporates by reference the preceding paragraphs.

193.     NewAge owns and possesses certain confidential, proprietary, and trade secret information, including, but not limited to the Brand Partner Information described herein.

194.     NewAge's confidential, proprietary, and trade secret information relates to products and services used and sold, or intended to be used and sold, in interstate or foreign commerce.

195.     NewAge has taken reasonable measures to keep such information secret and confidential, including requiring its employees to enter into confidentiality and non-disclosure agreements, by limiting access to the information to employees with a business need to know, by password protecting the information contained on NewAge's databases.

196.     NewAge's confidential, proprietary, and trade secret information is not available for others in NewAge's industry to use through legitimate means.

197.     NewAge's confidential, proprietary, and trade secret information derives independent economic value, both actual and potential, from not being generally known to the public and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

198.     In violation of NewAge's rights, Defendants have misappropriated NewAge's confidential, proprietary, and trade secret information in the improper and unlawful manner alleged herein.

199.     Defendants' misappropriation of NewAge's confidential, proprietary, and trade secret information was intentional, knowing, willing, malicious, fraudulent, and oppressive.

200.     If Defendants are not enjoined, they will continue to misappropriate the use of NewAge's trade secret information to their own benefit and NewAge's detriment.

201.     NewAge is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A) to prevent any retention, use, or threated use or disclosure by Defendants, or any of them, of NewAge's confidential, proprietary, and trade secret information.

202.     NewAge is entitled to recover an award of damages for actual loss caused by the acquisition, disclosure, or use of NewAge's trade secrets.

203.     NewAge is further entitled to recover any unjust enrichment (not already included in the calculation of actual loss) that was received by Defendants as a result of Defendants' acquisition, disclosure, or use of NewAge's trade secrets.

204.     Because Defendants willfully and maliciously misappropriated NewAge's trade secrets, NewAge is entitled to recover an award of exemplary damages up to two times the sum of actual loss and unjust enrichment damages.

205.     Because Defendants willfully and maliciously misappropriated NewAge's trade secrets, NewAge is entitled to recover an award of reasonable attorney fees incurred in this action.

## COUNT ELEVEN

### Misappropriation of Trade Secrets (UT UTSA)
### (Against Cooper, Wilson, Willis, and Kwikclick)

206.     NewAge incorporates by reference the preceding paragraphs.

207.    NewAge's confidential, proprietary, and trade secret information, including, but not limited to NewAge's Brand Partner Information described above, constitutes trade secrets as defined by the Utah Uniform Trade Secrets Act, Utah Code § 13-24-2.

208.    Defendants had access to, became familiar with, and gained intimate knowledge of NewAge's confidential, proprietary, and trade secret information.

209.    As alleged above, NewAge derives independent economic value, both actual and potential, from this confidential, proprietary, and trade secret information not being generally known to the public and not being readily ascertainable through proper means by another person who can obtain economic value from its disclosure or use.

210.    As alleged above, NewAge took reasonable measures to maintain the secrecy of this confidential, proprietary, and trade secret information, including by requiring its employees to enter confidentiality and non-disclosure agreements and by limiting and password protecting access to information contained on NewAge databases.

211.    Defendants have, without NewAge's consent, disclosed and used, threated to disclose and use, and will inevitably disclose and use, NewAge's confidential, proprietary, and trade secret information to benefit themselves, Kwikclick, and/or another entity competitive with NewAge.

212.    Defendants' conduct constitutes misappropriation under the Utah Uniform Trade Secrets Act. Defendants knew or should have known under the circumstances that: (a) the information misappropriated was confidential information, proprietary information, and trade secrets; (b) the confidential information, proprietary information, and trade secrets were acquired through improper means; (c) the confidential information, proprietary information, and trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or limit

their use; and/or (d) the confidential information, proprietary information, and trade secrets were derived from and through a person who owed a duty to NewAge to maintain their secrecy or limit their use.

213.    Pursuant to Utah Code § 13-24-4(1), NewAge is also entitled to recover both the actual loss caused by the misappropriation and the unjust enrichment that is not taken into account in computing actual loss.

214.    As a direct and proximate result of Defendants' conduct, NewAge has incurred and will incur damages.

215.    Upon information and belief, unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use NewAge's confidential information, proprietary information, and trade secrets to enrich themselves, Kwikclick, and/or another entity competing with NewAge and to divert business from NewAge to NewAge's competitors. Pursuant to Utah Code § 13-24-3, NewAge is entitled to an injunction against the misappropriation and continued threatened misappropriation of confidential information, proprietary information, and trade secrets as alleged herein. NewAge further asks the Court to restrain Defendants from using all confidential, proprietary, and trade secret information misappropriated from NewAge and to return all such information to NewAge.

216.    Defendants have misappropriated NewAge's confidential, proprietary, and trade secret information willfully and maliciously. Accordingly, NewAge is entitled to an award of its attorneys' fees and an award of exemplary damages, pursuant to Utah Code §§ 13-24-4 and -5.

### COUNT TWELVE

**Breach of Contract – Covenant Not to Compete and Not to Solicit**
**(Against Cooper)**

217.    NewAge incorporates by reference the preceding paragraphs.

218.    NewAge and Cooper are parties to the Cooper Noncompete Agreement.

219.    The Cooper Noncompete Agreement remains in full force and effect. NewAge has fully performed under the Cooper Noncompete Agreement.

220.    Cooper is bound by the restrictive covenants contained in the Cooper Noncompete Agreement, including a covenant not to disclose confidential information of Ariix or NewAge, a nonsolicitation covenant, and a covenant not to compete.

221.    Cooper has breached the restrictive covenants of the Cooper Noncompete Agreement.

222.    Cooper has threatened to further breach the restrictive covenants of the Cooper Noncompete Agreement.

223.    Upon information and belief, unless and until enjoined and restrained by order of this Court, Cooper will continue to breach the restrictive covenants of the Cooper Noncompete Agreement.

224.    As a result of Cooper's breaches and threated breaches of the Cooper Noncompete Agreement, NewAge has suffered damages.

## <u>COUNT THIRTEEN</u>
### **Breach of Contract – Covenant Not to Compete**
### **(Against Cooper and Wilson)**

225.    NewAge incorporates by reference the preceding paragraphs.

226.    The Merger Agreement is a valid and binding contract between, among others, NewAge, Cooper and Wilson.

227.    NewAge has performed all obligations due under the Merger Agreement.

228.    The Merger Agreement contains a perpetual confidentiality restrictive covenant to which Cooper and Wilson agreed to be bound.

229.   The Merger Agreement contains certain restrictive covenants to which Wilson agreed to be bound, including a two-year non-competition provision and a two-year non-solicitation provision.

230.   The restrictive covenants of the Merger Agreement remain in full force and effect.

231.   In the alternative, if the terms of the purported August 18, 2021 letter agreement are found to be valid, then Cooper agreed to be bound by the restrictive covenants of the Merger Agreement, including a two-year non-competition provision and a two-year non-solicitation provision.

232.   Cooper and Wilson breached the confidentiality covenants of the Merger Agreement by using Brand Partner Information NewAge purchased from Ariix to advance the interests of a competing network marketing company. Cooper and Wilson have threated to continue to misuse NewAge's confidential information in breach of the confidentiality provisions of the Merger Agreement.

233.   Cooper and Wilson breached the noncompetition covenant of the Merger Agreement by working to assist a competing network marketing company before the expiration of the noncompetition covenant. On information and belief, absent an injunction, Cooper and Wilson will continue to compete with NewAge.

234.   Cooper and Wilson breached the non-solicitation covenant of the Merger Agreement by distributing shares in Kwikclick to NewAge employees and Brand Partners in an effort to buy their loyalty and induce them to compete against NewAge. Cooper and Wilson breached the non-solicitation covenant of the Merger Agreement by soliciting NewAge employees and Brand Partners to work with Cooper and Wilson in a new competing network marketing venture.

## COUNT FOURTEEN

### Tortious Interference with Contractual Relations
### (Against Cooper, Wilson, Willis, and Kwikclick)

235.    NewAge incorporates by reference the preceding paragraphs.

236.    NewAge has existing contractual relationships with its Brand Partners, who agree to binding terms and conditions as a condition of signing up as a NewAge Brand Partner.

237.    NewAge reasonably expects that its relationships with its Brand Partners will continue, absent any unfair interference with the relationship between NewAge and its Brand Partners.

238.    NewAge makes sales to its customers through its network of hundreds of thousands of Brand Partners. Those Brand Partners sell NewAge products to their networks.

239.    NewAge reasonably expects to continue to make sales of products to its customers through its Brand Partners.

240.    Defendants intentionally interfered with the existing and expected contractual relationships and advantageous economic relationships.

241.    Defendants used improper means to achieve their interference with NewAge's existing and expected contracts and relationships, including at least the fraudulent conduct alleged herein, the misuse of NewAge confidential information and trade secrets, Defendants' willful breaches of contractual duties owed to NewAge, and Defendants' breaches or aid in breaches of fiduciary duties owed to NewAge.

242.    As a result of Defendants' interference with NewAge's existing and expected contracts and relationships, NewAge has suffered damages.

**COUNT FIFTEEN**

**Conspiracy**
**(Against Cooper, Wilson, Willis, and Kwikclick)**

243.    NewAge incorporates by reference the preceding paragraphs.

244.    On information and belief, Defendants have come together (with others) and agreed to form a new network marketing company to compete with NewAge.

245.    On information and belief, there was a meeting of Defendants' minds with respect to the purpose of forming a new network marketing company to compete with NewAge.

246.    In furtherance of their purpose to form a new network marketing company to compete with NewAge, Defendants committed one or more unlawful, overt acts. Those unlawful, overt acts included intentional breaches of the various contractual duties owed to NewAge by Defendants, the breaches of fiduciary duties owed to NewAge, the aiding and abetting breaches of fiduciary duties owed to NewAge, threatening the stalking horse bidder for NewAge's assets out of bankruptcy, misappropriation of NewAge's trade secrets and confidential information, Defendants' fraudulent conduct in furtherance of the conspiracy, and the other tortious conduct alleged herein.

247.    As a direct and proximate result of Defendants' conspiracy, NewAge has suffered damages.

**COUNT SIXTEEN**

**Unjust Enrichment**
**(Against Cooper, Wilson, Willis, and Kwikclick)**

248.    NewAge incorporates herein the preceding paragraphs.

249.    NewAge conferred a benefit on Defendants by paying Kwikclick a licensing fee, providing Defendants access to confidential information and trade secrets, exhibiting public trust and confidence in Defendants Cooper, Wilson and Willis, providing marketing and publicity

opportunities to Defendants Cooper, Wilson and Willis, and promoting the use of Kwikclick to NewAge's Brand Partners.

250.    Defendants knowingly accepted the benefits conferred on them by NewAge.

251.    Defendants accepted and retained the benefits conferred on them by NewAge under circumstances that make it inequitable for them to do so, including the fact that Defendants have worked together to deprive NewAge of the benefits of its bargain to purchase Ariix, forced NewAge to sign a license agreement with Kwikclick that primarily benefitted Defendants over NewAge, and actively concealed from NewAge that the Kwikclick software was in fact based on intellectual property NewAge purchased from Ariix.

**COUNT SEVENTEEN**
**Declaratory Judgment – Ownership of Kwikclick Software**
**(Against Kwikclick)**

252.    NewAge incorporates herein the preceding paragraphs.

253.    Kwikclick claims that it is the sole owner of Kwikclick software and any related intellectual property protections with respect to Kwikclick software. Kwikclick has demanded that NewAge pay a license fee in order to use the Kwikclick software.

254.    An actual, present, and justiciable controversy has arisen between NewAge and Kwikclick concerning ownership of the Kwikclick software and NewAge's rights in the Kwikclick software.

255.    NewAge seeks a declaratory judgment from this Court that it is the rightful owner of the Kwikclick software and any associated intellectual property rights claimed by or through Kwikclick and that it has a right to use the Kwikclick software independent of any license from Kwikclick.

**COUNT EIGHTEEN**
**Turn-Over of Property of the Estate under 11 U.S.C. § 542(a)**
**(Against Kwikclick)**

256.    NewAge incorporates herein the preceding paragraphs.

257.    In the event NewAge is deemed to be the owner of certain or all of the assets of Kwikclick, including the ICONN source code, NewAge's interest in such assets are property of their bankruptcy estates under Section 541 of the Bankruptcy Code.

258.    NewAge is entitled to turnover of the assets of Kwikclick pursuant to 11 U.S.C. § 542.

**COUNT NINETEEN**
**Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550**
**(Against Kwikclick)**

259.    NewAge incorporates herein the preceding paragraphs.

260.    Since at least 2020, Defendants have employed the labor and acumen of NewAge to develop the ICONN source code and have generated substantial value as a result of this development. Further, the ICONN source code was part of the assets acquired by NewAge in the Merger Agreement.

261.    Defendants Cooper, Wilson and Willis, purportedly acting on behalf of NewAge, transferred certain of NewAge's assets, including the ICONN source code, to Defendant Kwikclick.

262.    This transfer was made within 2 years of the date NewAge filed its chapter 11 bankruptcy petitions.

263.    Defendants Cooper, Wilson and Willis made this transfer with the actual intent to hinder, delay, and/or defraud NewAge's creditors and equity holders.

264.    NewAge is entitled to recover the transferred assets, including the ICONN source code.

### COUNT TWENTY

**Avoidance and Recovery of Constructive Fraudulent Transfer Under 11 U.S.C.
§§ 548(a)(1)(B) and 550
(Against Cooper, Wilson, Willis, and Kwikclick)**

265.    NewAge incorporates herein the preceding paragraphs.

266.    Since at least 2020, Defendants have employed the labor and acumen of NewAge to develop the ICONN source code and have generated substantial value as a result of this development. Further, the ICONN source code was part of the assets acquired by NewAge in the Merger Agreement.

267.    Defendants Cooper, Wilson and Willis, purportedly acting on behalf of NewAge, transferred certain of NewAge's assets, including the ICONN source code, to Defendant Kwikclick.

268.    This transfer was made within 2 years of the date NewAge filed its chapter 11 bankruptcy petitions.

269.    NewAge did not receive any value, let alone reasonably equivalent value, in exchange for the assets transferred to Kwikclick.

270.    When the ICONN source code was transferred to Kwikclick, NewAge was insolvent or became insolvent as a result of the transfer.

271.    When the ICONN source code was transferred to Kwikclick, NewAge was engaged in business, or was about to engage in business, for which NewAge's remaining property was an unreasonably small capital.

272.    When the ICONN source code was transferred to Kwikclick, NewAge intended to incur or believed that it would incur debts that would be beyond its ability to pay as such debts matured.

273.    The transfer of the ICONN source code was for the benefit of Defendants Cooper, Wilson, and Willis—all of whom are insiders—under an employment contract and not in the ordinary course of business.

274.    NewAge is entitled to recover the transferred assets, including the ICONN source code.

## COUNT TWENTY-ONE

**Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Utah Uniform Voidable Transactions Act, Utah Code § 25-6-101 et seq. (Against Cooper, Wilson, Willis, and Kwikclick)**

275.    NewAge incorporates herein the preceding paragraphs.

276.    Since at least 2020, Defendants have employed the labor and acumen of NewAge to develop the ICONN source code and have generated substantial value as a result of this development. Further, the ICONN source code was part of the assets acquired by NewAge in the Merger Agreement.

277.    Defendants Cooper, Wilson and Willis, purportedly acting on behalf of NewAge, transferred certain of NewAge's assets, including the ICONN source code, to Defendant Kwikclick.

278.    This transfer was made within 2 years of the date NewAge filed its chapter 11 bankruptcy petitions.

279.    Defendants Cooper, Wilson and Willis made this transfer with the actual intent to hinder, delay, and/or defraud NewAge's creditors and equity holders.

280.    NewAge did not receive any value, let alone reasonably equivalent value, in exchange for the assets transferred to Kwikclick.

281.    When the ICONN source code was transferred to Kwikclick, NewAge was insolvent or became insolvent as a result of the transfer.

282.    NewAge is entitled to recover the transferred assets, including the ICONN source code.

## COUNT TWENTY-TWO

**Imposition of Constructive Trust - Fraud**
**(Against Cooper, Wilson, Willis, and Kwikclick)**

283.    NewAge incorporates herein the preceding paragraphs.

284.    As a result of Defendants' actual or constructive fraudulent conduct and/or wrongful transfer of the ICONN source code, Kwikclick holds title to this property.

285.    Defendants are insiders of NewAge.

286.    There was an express and/or implied promise between Defendants Cooper, Wilson and Willis on the one hand, purportedly acting on behalf of NewAge, and Kwikclick on the other hand.

287.    NewAge's transfer of certain of its assets, including the ICONN source code, to Kwikclick were on account of this promise between Defendants.

288.    This transfer of assets to Kwikclick was obtained through actual or constructive fraud, commission of a wrong and other unconscionable conduct, artifice, concealment and questionable means on the part of Defendants to the detriment of NewAge and its bankruptcy estates.

289.    The wrongful transfer to Kwikclick is contrary to equity and good conscience and, therefore, Kwikclick possesses the assets that were transferred that it ought not, in equity and good conscious, hold.

290.    Moreover, because Kwikclick has not paid for the benefits it received, Defendants have been unjustly enriched as a result of the wrongful transfer of NewAge's assets.

291.    NewAge's creditors have suffered harm as a result of the wrongful actions of Defendants.

292.    As a result of the wrongful transfer of NewAge's assets, including the ICONN source code, NewAge is entitled to a constructive trust over and against all assets that were transferred by Defendants and wrongfully diverted to Kwikclick.

**COUNT TWENTY-THREE**

**Tortious Interference with Contractual Relations**
**(Against Cooper, Wilson, Willis, and Kwikclick)**

293.    NewAge incorporates by reference the preceding paragraphs.

294.    NewAge has existing contractual relationships with DIP Financing, LLC, as evidenced by the Asset Purchase Agreement.

295.    NewAge reasonably expects the Asset Purchase Agreement will close, absent any unfair interference with the relationship between NewAge and DIP Financing, LLC.

296.    Defendants intentionally interfered with the existing and expected contractual relationships and advantageous economic relationships.

297.    Defendants used improper means to achieve their interference with NewAge's existing and expected contracts and relationships, including the fraudulent conduct alleged herein, the misuse of NewAge confidential information and trade secrets, Defendants' willful breaches of

contractual duties owed to NewAge, and Defendants' breaches or aid in breaches of fiduciary duties owed to NewAge.

298.    As a result of Defendants' interference with NewAge's existing and expected contracts and relationships, NewAge has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, NewAge prays that the Court enter judgment in its favor and against Defendants:

1.    restraining and enjoining Defendants, their agents, servants, representatives, employees, successors, and all other persons acting on their behalf or in concert with them from:

(a)    utilizing NewAge's confidential and proprietary business information, trade secrets, know-how, theories, techniques, procedures, methods, developments, inventions and/or improvements, (whether patentable or unpatentable), processes, production methods and sources, marketing and sales information,

(b)    requiring Defendants to return all documents, files, and materials evidencing any of the information set forth in paragraph (a) above;

(c)    soliciting and/or hiring NewAge's Brand Partners, employees, distributors, or representatives;

(d)    divulging to any entity or person NewAge's confidential, proprietary business information and/or trade secrets, and from distributing or disclosing any documents which contain or evidence such information;

(e)    using NewAge's confidential and proprietary information and/or trade secrets in any manner or fashion to compete directly or indirectly, with NewAge;

(f)     tortiously interfering with NewAge contracts and NewAge's prospective business advantage by soliciting NewAge's customers to terminate their agreements with NewAge or to diminish their business with NewAge;

(g)     directly or indirectly doing business (which shall include servicing, selling, soliciting the sale of or accepting orders from) with any customers or prospects NewAge, sold to, solicited the sale of or accepted orders from;

(h)     disparaging NewAge, its officers, directors, employees, representatives, and agents;

2.     Requiring Defendants to return to NewAge all confidential, proprietary business information and trade secrets;

3.     For money damages in an amount to be determined at trial, including

(a)     all unjust enrichment, gains, profits, and savings derived by Defendants by their improper conduct;

(b)     NewAge's lost profits, direct and consequential damages, actual loss, and other recoverable damages sustained as a result of Defendants' conduct;

(c)     a reasonable royalty for Defendant' unauthorized disclosure or use of NewAge's trade secrets;

(d)     exemplary damages;

(e)     punitive damages;

(f)     NewAge's attorneys' fees and costs;

4.     Imposing a constructive trust on profits, gains, and proceeds derived by Defendants' wrongful conduct;

5.      Entering a declaratory judgment that NewAge is the rightful owner of the Kwikclick software and any associated intellectual property rights claimed by or through Kwikclick and that NewAge has a right to use the Kwikclick software independent of any license from Kwikclick;

6.      Ordering rescission of the License Agreement; and

7.      Entering such other relief as the Court deems proper.

[*Signature Page Follows*]

Dated: October 7, 2022 **GREENBERG TRAURIG, LLP**

*/s/ Anthony W. Clark*
Anthony W. Clark (DE Bar No. 2051)
Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile:  (302) 661-7360
Email: Anthony.Clark@gtlaw.com
            Dennis.Meloro@gtlaw.com

-and-

Annette Jarvis (admitted *pro hac vice*)
Michael F. Thomson (admitted *pro hac vice*)
Marc Rasich (*pro hac vice* pending)
222 S. Main Street, Suite 1730
Salt Lake City, Utah 84101
Telephone: (801) 478-6900
Facsimile:  (801) 303-7397
Email: JarvisA@gtlaw.com
            ThomsonM@gtlaw.com
            Marc.Rasich@gtlaw.com

*Counsel for the Plaintiffs*